

John B. McEntire, IV
*Senior Litigator*
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Jesus A. Ortiz Gonzales

## United States District Court
### Eastern District of Washington
Honorable John T. Rodgers

| | |
|---|---|
| United States of America, | No. 2:20-CR-028-RMP-1 |
| Plaintiff, | No. 2:17-CR-165-RMP-1 |
| v. | |
| Jesus Antonio Ortiz-Gonzales, | Release Brief |
| Defendant. | |

# Table of Contents

I. Introduction .................................................................................................... 1

II. Background ..................................................................................................... 5

    A. Covid-19 surfaces, then spreads. ................................................................. 5

    B. Covid-19 is deadly—especially for people with comorbidities. ........................ 7

    C. Mr. Ortiz-Gonzales suffers from comorbidities. .......................................... 8

    D. To help slow Covid-19's spread and protect the vulnerable, health officials recommend aggressive measures for the public. .................................................................... 9

    E. These measures were adopted by government officials. ................................. 10

    F. To help slow Covid-19's spread and protect the vulnerable, health officials recommend aggressive measures for the incarcerated. ............................................... 10

    G. These measures were adopted (mostly) by government officials. ..................... 11

    H. Local jail officials want to follow health officials' advice, but recognize they aren't equipped to handle Covid-19. .................................................................. 12

    I. One agency initially resisted health officials' recommendations: DOJ. ........... 13

        1. Courts push back against DOJ's position, finding Covid-19 is a "compelling reason" for release under §3142(i). ................................................................. 14

        2. DOJ was unprepared for Covid-19. ..................................................... 16

    J. DOJ walks back its resistance, starts relaxing release rules. ......................... 18

    K. Mr. Ortiz's case is atypical. ..................................................................... 19

III. Discussion ..................................................................................................... 22

    A. The Bail Reform Act authorizes Mr. Ortiz's release under §3142, §3143. ........ 22

        1. Mr. Ortiz is not a genuine flight risk. ................................................. 22

        2. Mr. Ortiz is not a community danger. .................................................. 25

    B. The Bail Reform Act authorizes Mr. Ortiz's release under §3142(i). ............... 27

    C. Probation and the United States' concerns are addressable. ......................... 29

IV. Conclusion ..................................................................................................... 30

# I.    Introduction

How things change. In just 100 days, Covid-19 progressed from a regional outbreak in Wuhan to a global pandemic, infecting over 1.4 million people and killing over 83,000.[1] The United States leads the world in both cases and deaths, with over 400,000 infected and over 13,000 killed—both numbers growing by the minute.[2]

The virus spreads easily and is 5-35x deadlier than the flu,[3] with 1-in-6 becoming seriously ill and requiring hospitalization.[4] Those particularly susceptible to life-threatening complications are adults with underlying medical conditions, including obesity, diabetes, and asthma.

There is no cure for Covid-19, leaving healthcare professionals with a crude tool to curb its spread and protect vulnerable people with underlying medical conditions: social distancing. And while social distancing is possible—at tremendous cost—in the community, it is impossible in jail.

There are 584 individuals incarcerated at the Spokane County Jail.[5] Those individuals share cells, toilets, soap, food, phones, computers, and common areas—

---

[1] nyti.ms/NYT-Covid-19-World-Cases
[2] nyti.ms/NYT-Covid-19-US-Cases
[3] *See* Exhibit A (Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Johns Hopkins - ¶5.)
[4] bit.ly/WHO-Covid-19-QA
[5] https://www.spokanecounty.org/352/Inmate-Roster

and all live in less-than-hygienic conditions where hand-sanitizer (a necessity on the outside) is contraband on the inside.

There is also turnover. Within the last 48 hours, the jail released 70 individuals and booked 63.[6] Each day, dozens of corrections officers, medical personnel, and support staff enter the jail, interact with those inmates, and return to their families and our community, bringing back-and-forth to their families and neighbors (and to incarcerated individuals) any exposure they had during the day. This revolving door is why health official view jails as the perfect "petri dish"[7] to spread the virus further. To curb Covid-19's spread in jails, health officials insist jails should reduce their populations by releasing non-violent individuals, and individuals at-risk for severe illness.

Officials are listening. Across the country, thousands of at-risk inmates are being released, as there is growing recognition that "correctional health is public health," and "[d]ecreasing risk in prison and jails decreases risk to our communities."[8] This tidal shift in what's needed to protect our communities has reached the highest ranks of the federal government, with the Attorney General now

---

[6] bit.ly/SCJ-Daily-Inmate-Roster
[7] nyti.ms/JailsarePetriDishes
[8] *See* Exhibit B (Declaration of Dr. Brie Williams, Professor of Medicine at UCSF - ¶20).

directing line prosecutors to "consider the medical risks associated with individuals being remanded into federal custody," recognizing "each time a new person is added to a jail," it adds risk for those who work there and those who are incarcerated—especially "individuals who are vulnerable to a serious infection. . . ."[9]

Against this incredible backdrop, we have Jesus Ortiz-Gonzales, who is incarcerated at the Spokane County Jail on less-than-incredible charges: 1) he incorrectly thought his federal supervision obligations were suspended while he resolved a state supervision violation (he left Yakima without permission to care for a disabled friend); and 2) he found a rusted bullet on the ground and kept it to turn into a necklace.

Mr. Ortiz is not a risk to others, but is certainly at-risk himself, falling into the CDC's high-risk group for severe illness if Covid-19 surfaces at the jail.[10] And it's not if, but when, as Spokane County Jail staff recognizes "[t]he chances of Covid-19 coming into this building are pretty good . . . ."[11] To protect vulnerable individuals like him, Mr. Ortiz respectfully asks the Court to release him for the following reasons:

---

[9] https://www.law360.com/articles/1260965/attachments/0 at 2.
[10] bit.ly/CDC-At-RiskCategories
[11] bit.ly/Inlander-SCJ-Ill-Equipped

**First**, Mr. Ortiz is releasable under the Bail Reform Act's standard provisions, as he is not a flight risk. He has an approved release address, strong ties to the Yakima area, no current substance abuse issues, and legal status in the United States. His lapse in communication with Probation was a misunderstanding that won't be repeated, and doubts on flight can be addressed through strict conditions. And during this pandemic, courts must consider Mr. Ortiz's high-risk for serious illness from Covid-19 when assessing flight risk. *See* 18 U.S.C. § 3142(g)(3) (noting a judge, when assessing flight, must consider the individual's physical condition). Courts also recognize this pandemic has "significantly curtailed travel," reducing what would be flight risk in normal times. *See*, *e.g.*, *U.S. v. Davis*, 2020 WL 1529158 (D. Md. March 30, 2020) (noting the Covid-19 pandemic diminishes traditional flight risk concerns).

**Second**, Mr. Ortiz is releasable under the Bail Reform Act's standard provisions, as he is not a community danger. He has virtually no violence in his criminal history (it's mostly driving offenses), and his federal charges are based on possessing a bullet—just one, to be used for a necklace. He poses more of a risk to the community in-custody than being released on home confinement. *See*, *e.g.*, *U.S. v. Harris*, 2020 WL 1482342 (D. D.C. March 26, 2020) (the court released an individual pending sentencing, finding that "incarcerating Defendant while the

current Covid-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on [] strict conditions.").

***Third,*** even if the Court finds Mr. Ortiz is not releasable under the Bail Reform Act's standard provisions, he is releasable under §3142(i), a separate, independently-operation provision of the Bail Reform Act that authorizes temporary release when compelling reasons exist, a hurdle courts find is met in these unprecedented times. *See*, *e.g.*, *U.S. v. Kennedy*, 2020 WL 1493481 at \*4 ("Even if defendant did not have a heightened susceptibility to Covid-19, the public health crisis—and its impact on Defendant's ability to present a defense—nonetheless satisfies §3142(i).").

## II. Background

### A. Covid-19 surfaces, then spreads.

In December 2019, a novel coronavirus—named Covid-19—surfaced in Hubei Province, China.[12] In what started as a regional outbreak, Covid-19 spread worldwide, infecting over 1.4 million people in 177 countries in 100 days:[13]

---

[12] bit.ly/WHO-Covid-19-QA
[13] nyti.ms/NYT-Covid-19-World-Cases



The United States is particularly hard-hit, with Covid-19 infecting over 400,000 in every state and territory, killing over 13,000 Americans:[14]



[14] nyti.ms/NYT-Covid-19-US-Cases

The State of Washington is no exception. Covid-19 has infected over 8,600 in every county, killing 409 Washingtonians.[15] There are 231 cases and 13 deaths in Spokane County, with that number doubling every 7 days.[16]

It is everywhere—and spreading.

The reason behind Covid-19's prolific, rapid spread: it passes from person-to-person so easily. An infected person exhales; that exhale releases droplets, which land on surfaces—say, a doorknob—and survive for hours, even days; a healthy person touches that doorknob, then their eyes, nose, or mouth.

It's that simple.[17]

**B.    Covid-19 is deadly—especially for people with comorbidities.**

Many—including the president—compared Covid-19 to the common flu.[18] Facts show otherwise. Covid-19 is 5-to-35 times more fatal than the flu,[19] with 1-in-6 becoming seriously ill and developing difficulty breathing.[20] Those most likely to fall seriously ill are either older (65+) or possess underlying medical conditions, including 1) lung disease or asthma, 2) serious heart conditions, 3) severe obesity

---

[15] nyti.ms/NYT-Covid-19-US-Cases
[16] nyti.ms/NYT-Covid-19-US-Cases
[17] bit.ly/WHO-Covid-19-QA
[18] abcn.ws/45ComparesCovidtoFlu
[19] *See* Exhibit A (Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Johns Hopkins - ¶5.)
[20] bit.ly/WHO-Covid-19-QA

(40+ BMI), 5) diabetes, 6) kidney disease, 7) liver disease, and 8) conditions leaving someone immunocompromised (e.g., HIV).[21] This is especially true for individuals with comorbidities (two diseases present in one person at the same time).[22]

## C. Mr. Ortiz-Gonzales suffers from comorbidities.

Mr. Ortiz-Gonzales suffers from comorbidities. He not only is obese (48.3 BMI),[23] but also suffers from asthma, a condition documented in his PSIR years ago and aggravated by his panic attacks:[24]

**Physical Condition**

195. The defendant reports suffering from asthma, panic attacks, and depression. He is currently on Wellbutrin and Trazodone. Prior to his incarceration, the defendant reported taking Seroquel.

These vulnerabilities place him at "higher risk for severe illness from Covid-19."[25]

Mr. Ortiz-Gonzales is also vulnerable for a different, non-medical reason: he is a male. For reasons unknown, across the world, Covid-19 kills more men than women.[26]

---

[21] bit.ly/CDC-At-RiskCategories
[22] bit.ly/JohnsHopkinsCoMorbidities
[23] *See* ECF No. 19 at 2 (Declaration of Jesus A. Ortiz-Gonzales, which notes he is 65 inches tall and weighs 290 pounds, giving him a BMI of 48.3).
[24] *See U.S. v. Ortiz-Gonzales*, 2:17-CR-165-RMP, ECF No. 60 at ¶195.
[25] bit.ly/CDC-At-RiskCategories
[26] wapo.st/Covid-19-KillsMenMoreThanWomen

**D.      To help slow Covid-19's spread and protect the vulnerable, health officials recommend aggressive measures for the public.**

Given Covid-19's high fatality rate, researchers project that, *without* aggressive intervention efforts, 40 million people could die—*this year*.[27] Even *with* aggressive intervention efforts, researchers project up to 240,000 Americans could die.[28] These staggering numbers turn on supply & demand: there simply "are not enough lifesaving ventilators to go around, and there is no way to solve the problem before the disease reaches full throttle."[29] Health professionals project demand for ventilators will exceed supply as early as mid-April.[30] With supplies dwindling, health professionals started circulating hospital protocols for the inevitable choice doctors will face: "who lives and who dies."[31]

To help lessen Covid-19's strain on hospitals and protect our population's most vulnerable, health experts recommended several lesser measures, including the following: 1) washing hands; 2) avoiding contact with your eyes, nose, and mouth; 3) practicing good respiratory hygiene (covering your mouth when you cough or

---

[27] bit.ly/BI-40MillionDeaths
[28] wapo.st/Covid-19-USADeathProjections
[29] nyti.ms/Ventilators-Supply-Demand
[30] bit.ly/PublicHealth-VentilatorProjections
[31] nyti.ms/NYT-WhoLives-WhoDies

sneeze, etc.);[32] and 4) wearing facemasks in public (a new addition).[33] They also

recommended a more severe measure: stay-at-home orders.[34]

**E.     These measures were adopted by government officials.**

Governments responded. In the State of Washington, Governor Jay Inslee

declared a state emergency on February 29, limited gatherings over 250 people on

March 11, closed all schools on March 13, halted elective surgeries to preserve

medical equipment on March 19, and ordered non-essential workers to stay home on

March 23.[35]

**F.     To help slow Covid-19's spread and protect the vulnerable, health officials recommend aggressive measures for the incarcerated.**

Soon into this pandemic, health officials identified a high-risk environment for

Covid-19's spread: jails & prisons. Dr. Chris Beyrer, Professor of Epidemiology at

Johns Hopkins, identifies several reasons why prisons and "jails are petri dishes"[36]

for spread:

-    adhering to social distancing guidelines is "virtually impossible";

-    adhering to proper decontamination of surfaces is "virtually impossible";

[32] bit.ly/WHO-Covid-19-Advice-for-Public
[33] bit.ly/CDC-Recommends-FaceMasks
[34] n.pr/NPR-Stay-at-Home-Orders
[35] bit.ly/Inslee-Covid-19-Directives
[36] nyti.ms/JailsarePetriDishes

-   inmates have limited access to basic hygiene products;

-   there are too many shared spaces, including toilets, showers, and mess halls;

-   there is not only a high turnover rate in the inmate population, but also staff mix with inmates and then return to their homes; and

-   they are ill-equipped  (not only in medical equipment, but also protective gear).[37]

Given these concerns, health experts advised jails & prisons to immediately start releasing non-violent inmates, as "[d]ecreasing risk in prisons and jails decreases risk to our communities."[38] Simply put, "correctional health is public health."[39]

## G.    These measures were adopted (mostly) by government officials.

Governments (mostly) responded. In California, officials are releasing 3,500 inmates to reduce outbreak risks;[40] in New Jersey, officials are releasing 1,000 inmates;[41] in New York City, officials are releasing 900 inmates.[42] The releases aren't just in large metropolitan areas. In Tulsa, Oklahoma, officials released 75

---

[37] *See See* Exhibit A (Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Johns Hopkins - ¶¶13-15.)
[38] *See* Exhibit B (Declaration of Dr. Brie Williams, Professor of Medicine at UCSF - ¶20).
[39] *See* Exhibit B (Declaration of Dr. Brie Williams, Professor of Medicine at UCSF - ¶20).
[40] lat.ms/CDCReleases3500
[41] nyti.ms/NJ-Releases-1000
[42] bit.ly/NYC-Releases-900

people in a single day;[43] in Mercer, Pennsylvania, officials released 20% of its inmate population to free up space in the facility[44]; and in Washington County, Oregon, officials 120 people.[45] These are examples; more exist.

## H. Local jail officials want to follow health officials' advice, but recognize they aren't equipped to handle Covid-19.

The Spokane County Jail implemented procedures to help stem Covid-19's spread, but they aren't enough. The jail's screening procedures are minimal (they don't test newly-booked inmates, but rather check to see if they are symptomatic,[46] which is ineffective given CDC data suggests "[a]s many as 25 percent of people infected with the new coronavirus may not show symptoms. . . .")[47]; their mitigation procedures are insufficient (they clean common areas daily, but inmates aren't given increased access to showers or hygiene products, both of which are routinely shared);[48] their containment measures are rudimentary (if an inmate tests positive for Covid-19, that inmate will be masked and isolated); and they have no ability to

---

[43] https://bit.ly/2RfSpyG
[44] wapo.st/StatesReleasingPrisoners
[45] wapo.st/StatesReleasingPrisoners
[46] See Exhibit C (Declaration of Dawn A. Pitts)
[47] nyti.ms/AsymptomaticTransmission
[48] See Exhibit C (Declaration of Dawn A. Pitts)

treat Covid-19-related complications (they have no ventilators, so any inmate experiencing severe symptoms will be transferred to a local hospital).[49]

The jail acknowledges the issue. Tyler Olson, a Spokane County Jail corrections officer, told local officials it is "almost impossible" to practice social distancing, as corrections officers must "search everyone who comes into the jail, so the staff is literally touching everyone who comes in here . . . ."[50] That's especially true during the release period, when the jail lets "46 inmates out at a time and they're not in a big enough area where you can have a six foot [distance]."[51] Jailers acknowledge the reality: "[t]he chances of Covid-19 coming into this building are pretty good . . . ."[52]

I. **One agency initially resisted health officials' recommendations: DOJ.**

DOJ initially resisted health officials' calls to reduce its inmate populations, especially those in federal pretrial. Its reasons were many, but generally fell into two categories:

- Covid-19 is not a "compelling reason" for release reason under §3142(i) (a Bail Reform Act provision that allows courts to temporarily release individuals when "compelling reasons" exist); and

---

[49] See Exhibit C (Declaration of Dawn A. Pitts)
[50] bit.ly/Inlander-SCJ-Ill-Equipped
[51] bit.ly/Inlander-SCJ-Ill-Equipped
[52] bit.ly/Inlander-SCJ-Ill-Equipped

- DOJ was "prepared to handle the risks posed by Covid-19. . . ."[53]

Shortly after this resistance surfaced, courts started pushing back against DOJ's first reason, and DOJ started walking back the second.

### 1. Courts push back against DOJ's position, finding Covid-19 is a "compelling reason" for release under §3142(i).

A growing number of courts agree Covid-19-related concerns are a compelling, *independent* basis for release under the Bail Reform Act—be it a pretrial posture, a post-plea, pre-sentence posture, or a SR posture:

| Court | Decision |
|---|---|
| *U.S. v. Stephens*, 2020 WL 1295155 (S.D.N.Y., March 19, 2020). | In a SR case, the district court held the "obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. 3142(i)." |
| *U.S. v. Michaels*, 2020 WL 1482553 (C.D. Ca., March 26, 2020) | "Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason.'" |
| *U.S. v. Chandler*, 2020 WL 1528120 (S.D.N.Y, March 31, 2020) | "The extraordinary burdens imposed by the coronavirus pandemic, in conjunction with Chandler's right to prepare for his defense, certainly constitute a 'compelling reason' that permit this Court to order the temporary release of Chandler pursuant to 18 U.S.C. § 3142(i)." |
| *U.S. v. Kennedy*, 2020 WL 1493481 (E.D. Mi., March 27, 2020) | "Under any possible interpretation of §3142(i)'s language, current events and Defendant's particular vulnerability to the disease constitute compelling reason for release under §3142(i)." |

---

[53] *See, e.g., U.S. v. Steward*, 20-CR-052-DLC (S.D.N.Y March 24, 2020) (USAO Opposition).

| Court | Decision |
|---|---|
| *U.S. v. Little*, 2020 1439979 (S.D.N.Y March 24, 2020) (emphasis in original) | "The circumstances that existed when Jerlaine Little was ordered detained have now changed. There is a pandemic that poses a direct risk to Jerlaine Little *due to her present (and future) medical conditions* . . . ." |
| *U.S. v. Perez*, 2020 WL 1329225 (S.D.N.Y. March 19, 2020) | Court grants release under §3142(i) "based on the unique confluence of serious health issues and other risks facing this defendant, including but not limited to the defendant's serious progressive lung disease . . . that place him at a substantially heightened risk of dangerous complications should [he] contract Covid-19 as compared to most other individuals." |
| *U.S. v. Knight*, 2020 WL 1558152 (E.D. Mi. March 24, 2020) | In a SR case, the Court granted release under §3142(i), finding "Defendant's respiratory condition [bronchial asthma] [] makes him particularly vulnerable to this disease. . . ." |
| *U.S. v. Hernandez*, 2020 WL 1503106 (S.D.N.Y. March 30, 2020) | District court releases under §3142(i), finding "the defendant's age (64 years old), asthma, and high blood pressure" place him "at a substantially heightened risk of dangerous complications should he contract Covid-19 as compared to most other individuals." |
| *U.S. v. Garcha*, 2020 WL 1593942 (N.D. Cal. April 1, 2020) | In a pretrial case involving §922(g)(1), the Court granted release under §3142(i), finding the defendant's medical conditions—HIV+, a brain tumor, and a prior pulmonary embolism—warranted release based on Covid-19. |

These decisions grow by the day, especially as Covid-19's spread increases.[54]

---

[54] Other courts release inmates for Covid-19-related concerns using other subsections under the Bail Reform Act. *See, e.g., U.S. v. Fellela*, 2020 WL 1457877 (D. Conn. March 20, 2020) (in a post-plea, pre-sentence context, the district court released the defendant under §3143(a)(1) in an agg-ID case with SR violations based on his heightened risk—62-years-old, 300 pounds, and diabetes); *U.S. McDuffie*, 2020 WL 1659879 (S.D.N.Y. April 3, 2020) (in a post-plea, pre-sentence context, the district court released the defendant under §3145(c)(1) in a drug-distribution case based on "the combination of a once-in-a-lifetime pandemic and an immunize system disorder. . . .").

## 2. DOJ was unprepared for Covid-19.

For weeks, the DOJ assured the public—and courts—it was prepared for Covid-19, touting its efforts in briefs across the country opposing release:

| Date | Position | Case |
|---|---|---|
| 03.19.20 | "The risk of [a Covid-19] outbreak is speculative at this time. Currently there are **no reported cases** of Covid-19 at any facility operated by the Bureau of Prisons." | *See U.S. v. Grayson*, 2:19-CR-135-JLR (W.D. Wash., Mar. 19, 2020), ECF No. 40 (emphasis added). |
| 03.24.20 | "Thanks to BOP's efforts . . . as of today, despite tens of thousands of confirmed Covid-19 cases across the country, **only three inmates** in the BOP's custody, and only three BOP staff members, have been diagnosed with Covid-19." | *See U.S. v. Esparza*, No. 1:07-CR-294-BLW (D. Id. Mar. 24, 2020), ECF No. 121 (emphasis added). |
| 03.25.20 | "Thanks to BOP's efforts, despite tens of thousands of confirmed Covid-19 cases across the country, **only six inmates** in BOP custody has [sic] been diagnosed with Covid-19 as of today." | *See U.S. v. Henry*, 4:19-CR-790 (E.D. Mo. Mar. 25, 2020), ECF No. 28 (emphasis added). |

But sadly, DOJ wasn't following health officials' recommendations.

An example: On March 19, FCI-Oakdale Correctional Officer Aubrey Melder transported a Covid-19-infected prisoner to the local hospital for testing, "spending six hours in close contact with the ailing man" with nothing but a pair of gloves.[55] The BOP's chief health office did not place CO Melder in quarantine; instead, she ordered him back on the job, with instructions to advise supervisors if he started

---

[55] https://bit.ly/OnlyGloves

showing symptoms—directly contradicting CDC advice.[56] So CO Melder continued to work and interact with inmates and other corrections officers. Within days, inmates started coughing and exhibiting fevers, but weren't separated from cellmates.[57]

This was DOJ's approach across the country. Then Covid-19 cases started skyrocketing, corrections staff started getting sick, inmates started dying:



DOJ realized it did not have things under control.

[56] https://bit.ly/OnlyGloves
[57] https://bit.ly/Oakdale-Under-Siege

## J.    DOJ walks back its resistance, starts relaxing release rules.

On April 5, 2020, an ***eighth*** DOJ inmate died in custody from Covid-19-related complications.[58] There are now 241 inmates and 73 staff across 34 DOJ facilities who have tested positive for Covid-19,[59] although data suggests DOJ is underreporting its numbers.[60]

In response to these rising numbers, and recognizing DOJ's Covid-19-related precautions "have not been perfectly successful," the Attorney General declared an emergency on April 3, 2020, and directed certain BOP facilities to ramp up the use of home confinement for "all inmates who have Covid-19 risk factors, as established by the CDC . . . ."[61]

Three days later, the Attorney General extended this walk-back to pretrial cases, directing line prosecutors to "consider the medical risks associated with individuals being remanded into federal custody during the Covid-19 pandemic."[62] In explaining his decision, the Attorney General recognized pretrial detention poses a risk to inmates, corrections officers, and the community as a whole. Now

---

[58] bit.ly/8thInmateDies
[59] https://www.bop.gov/coronavirus/
[60] bit.ly/BOPUnderReportingCovid19
[61] politi.co/AG-Declares-BOP-Emergency
[62] https://www.law360.com/articles/1260965/attachments/0 at 2.

prosecutors must weigh "the risk of flight and seriousness of the offense" against "the defendant's vulnerability to Covid-19."[63]

## K. Mr. Ortiz's case is atypical.[64]

On April 12, 2019, Mr. Ortiz started a three-year supervision term after completing his sentence for unlawfully possessing a pistol.[65] He released to a probation-approved address in Yakima, got situated, and started work at Borton Fruit a few weeks later.

Now situated, Mr. Ortiz's probation officer directed him to complete a substance abuse evaluation. He did so; no treatment needed.

For the next few months, Mr. Ortiz did as he was told. He checked in with Probation, worked a job, and otherwise followed conditions.

Then something happened. During the Fourth of July, Mr. Ortiz received a call from Melanie Caton, a long-time friend who is disabled and lives in Ephrata. She needed help. (Ms. Caton has at-home caregivers during the week, but is on her own during the weekends.) Mr. Ortiz did not hesitate; he left his job the following day (a Friday), found a ride, and traveled to Ephrata to see Ms. Caton. He stayed through the weekend to provide much-needed care.

---

[63] https://www.law360.com/articles/1260965/attachments/0 at 2.
[64] The following facts are based on both a proffer and police reports.
[65] 2:17-CR-165-RMP-1, ECF No. 73 (SR Violation Petition #1).

The following week, Mr. Ortiz's DOC officer called him to advise he was being violated for traveling to Ephrata without permission, and would need to return to Yakima immediately and surrender for a 19-day jail sanction. Mr. Ortiz explained to his DOC officer he could not return immediately, as he lacked a ride; his DOC officer responded that a warrant would issue for his arrest.

So Mr. Ortiz sat and waited for police to arrive, arrest him, and return him to Yakima. Only they didn't show. Hours passed, then a day, then two, then several— nothing. And instead of reaching out to DOC about ways to facilitate his return to Yakima, Mr. Ortiz decided (wrongly) to stay at Ms. Caton's house and continue to help her until police arrived—but they never did.

During this time, Mr. Ortiz also stopped reaching out to U.S. Probation, as required. He viewed (wrongly) his state and federal supervisions as one-in-the-same, treating a violation with one (DOC) as suspending his obligations with the other (USPO) until his violation was resolved, his 19-day jail sanction was served, and he was back on the clock.

In response to Mr. Ortiz's failure to reach out, the U.S. Probation Office filed a Petition in August 2019, alleging Mr. Ortiz 1) failed to pay his $100 SPA,

2) failed to report in early-August, 3) failed to report his move to Ephrata, and 4) wrongly claimed to work at Borton Fruit after his employment ended.[66]

In mid-December 2019, a police officer stopped Mr. Ortiz while he was walking with a friend (Mary Aldana) in the Quincy area. The officer ran Mr. Ortiz's name, saw he had warrants (one from DOC; the other from the Court), and arrested him without issue. During a search-incident-to-arrest, the officer located a single bullet in Mr. Ortiz's pocket.

As the officer looked at the bullet, Ms. Aldana admonished Mr. Ortiz: "see, I told you to fucking leave it there."[67] Ms. Aldana continued her admonishment, now directing it at both Mr. Ortiz and the officer: "we went fishing, he fucking found it and thought it was cool, and he was going to make it into a necklace and I told him to freaking leave it there . . . ." Mr. Ortiz acknowledged to the officer—on camera—he shouldn't have picked up the bullet.

In response to Mr. Ortiz's on-body-camera admission, the U.S. Probation Office filed a second Petition in January 2020, alleging Mr. Ortiz improperly possessed a bullet (Violation #5).[68] Then a grand jury charged Mr. Ortiz for

---

[66] *See* 17-CR-165-RMP, ECF No. 73.

[67] The entire exchange is captured on body camera.

[68] *See* 17-CR-165-RMP, ECF No. 79.

improper bullet possession,[69] and Probation followed up with a third Petition, now alleging Mr. Ortiz violated federal law by possessing a bullet (Violation #6).[70]

## III.   Discussion

### A.   The Bail Reform Act authorizes Mr. Ortiz's release under §3142, §3143.

Mr. Ortiz is releasable under the Bail Reform Act's standard provisions—both of them. The detention standard here is mixed. For Mr. Ortiz's SR case, he carries the burden to prove he is neither a flight risk nor community danger. *See* Fed. R. Crim. P. 32.1(a)(6) (noting the burden in SR cases); for Mr. Ortiz's new charge, the United States carries the burden. *See, e.g., U.S. v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

#### 1.   Mr. Ortiz is not a genuine flight risk.

There are several reasons Mr. Ortiz is not a flight risk.

***First***, Mr. Ortiz's higher-risk for serious illness from Covid-19 is a factor the Court must consider when assessing flight. *See* 18 U.S.C. § 3142(g)(3) (noting a judge, when assessing flight, must consider the individual's physical condition); *see also Attorney General's April 6, 2020 Memo to Prosecutors on Pretrial Release* ("…in applying the familiar BRA analysis, which already includes some consideration of

---

[69] *See* 20-CR-028-RMP, ECF No. 1.
[70] *See* 17-CR-165-RMP, ECF No. 90.

the defendant's 'physical and mental condition,' [] you should now consider the medical risks associated with individuals being remanded into federal custody during the Covid-19 pandemic.").[71]

**Second,** during this Covid-19 pandemic, travel is severely restricted, which courts recognize reduce traditional concerns about flight risk. *See, e.g., U.S. v. Ramos,* 2020 WL 1478307 at *1 (D. Mass. March 26, 2020) ("[T]he court finds that the circumstances of the Covid-19 pandemic diminish" flight risk); *see also U.S. v. Davis,* 2020 WL. 1529158 (D. Md. March 30, 2020) (same).

**Third**, he has a stable release address. Mr. Ortiz's mother (Fabiola Lopez) lives in a home in Yakima (Probation previously approved this home when Mr. Ortiz began SR in April 2019). There are no drugs, weapons, or dangerous animals in the home. There are 2-3 bottles of alcohol leftover from holiday parties, but Ms. Lopez will remove those if needed.

**Fourth**, his pending SR violation for "failing to report" was a misunderstanding. In April, May, June, and early-July, Mr. Ortiz followed Probation's directions. He secured employment, completed a substance abuse evaluation, and reported as directed. Then he received a DOC violation for leaving Yakima to help his disabled friend, and assumed his violation status tolled his

---

[71] https://www.law360.com/articles/1260965/attachments/0 at 2.

reporting requirements for both DOC *and* U.S. Probation. Yes, Mr. Ortiz wrongly assumed he was "off-the-hook" on reporting requirements, but his incorrect assumption isn't the issue; the issue is whether he can follow directions and report as directed—and as his multi-month compliance record *before* this thinking error shows, he can. He *will not* repeated this error, and will diligently check-in with Probation as often as the Court directs.

**Fifth**, he does not have a substance abuse disorder. In April 2019, Probation directed Mr. Ortiz to complete a substance abuse evaluation. He did; no treatment necessary. His drug-free status alleviates a recurring concern courts have about the reliability of individuals with substance abuse disorders.

**Sixth,** Mr. Ortiz will not flee to Mexico. On November 5, 2013, an immigration judge granted Mr. Ortiz's application for withholding of removal under the Convention Against Torture, finding there were credible grounds to believe Mr. Ortiz would be harmed if removed to Mexico. These grounds remain today. Mr. Ortiz will not return to Mexico; it's too dangerous for him.

To be sure, the Court is right to hesitate about flight risk given his galactically-poor assumption he was off-the-hook on reporting requirements until his DOC violation resolved. But the explanation above, coupled with a stable address, sobriety, and strict release conditions (home detention and monitoring) should

manage these concerns, especially when the Bail Reform Act does not seek

"ironclad guarantees." *U.S. v. Chen*, 820 F. Supp. 1205,1208 (S.D. Fla. 2005).

### 2. Mr. Ortiz is not a community danger.

There are several reasons why Mr. Ortiz is not a community danger.

*First*, Mr. Ortiz's higher-risk for serious illness from Covid-19 is a factor the Court must consider when assessing danger. *See* 18 U.S.C. § 3142(g)(3) (noting a judge, when assessing community, must consider the individual's physical condition); *see also U.S. v. Harris*, 2020 WL 1482342 (D. D.C. March 26, 2020) (the court released an individual pending sentencing, finding that "incarcerating Defendant while the current Covid-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on [] strict conditions.").

*Second*, there is little in Mr. Ortiz's criminal history suggesting he is violent. While Mr. Ortiz has 18 convictions, 12 are for driving without a license (or similarly-situated offenses).[72] And as explained to the Honorable Rosanna Peterson at sentencing in the underlying firearm case, those citations were based on necessity. Mr. Ortiz lived in rural Grant County, where there is no public transportation, and

---

[72] *See U.S. v. Ortiz-Gonzales*, 2:17-CR-165-RMP, ECF No. 60 (PSIR) at ¶¶ 39, 43, 59, 62, 68, 77, 81, 84, 87, 92, 96, and 102.

he needed to get to work. Of the remaining 6 convictions, 3 are for theft, 1 was for unlawfully possessing a firearm (the underlying federal conviction), and 1 was for simple drug possession.[73] Only 1, a 2017 conviction for 3d assault, involves any kind of violence.[74] A single, 4-year-old conviction for 3d assault is not enough to label Mr. Ortiz a "community danger."

*Third*, there is nothing in Mr. Ortiz's new charge suggesting he is violent. To the contrary, Quincy police stopped Mr. Ortiz on the street, arrested him without issue (no running or resistance), and pulled a single bullet from his pocket, which Mr. Ortiz intended to use as a centerpiece for a necklace. Nothing in the current charges are enough to label Mr. Ortiz a "community danger."

*Fourth*, there are no allegations (or evidence) Mr. Ortiz either uses or distributes drugs, so his release will not place the community at risk.

*Fifth*, there is nothing dangerous about Mr. Ortiz's current charges. He picked up a bullet, thought it looked cool, and wanted to make a necklace from it.

There is no credible evidence Mr. Ortiz presents a risk to the Yakima community.

---

[73] *See U.S. v. Ortiz-Gonzales*, 2:17-CR-165-RMP, ECF No. 60 (PSIR) at ¶¶ 47, 50, 64, 72, and 113.
[74] *See U.S. v. Ortiz-Gonzales*, 2:17-CR-165-RMP, ECF No. 60 (PSIR) at ¶¶ 106.

**B.** **The Bail Reform Act authorizes Mr. Ortiz's release under §3142(i).**

If the Court finds Mr. Ortiz is not releasable under the Bail Reform Act's primary tests, then he is releasable under a separate provision within the Bail Reform Act: §3142(i). This provision operates independently from §3142(g), (f); that is, *even if* a court detained a person under those provisions, it could still release that person under §3142(i). *See, e.g., U.S. v. Stephens*, -- F. Supp.3d --, 2020 WL 1295155 (S.D.N.Y. March 19, 2020) ("Even if the Court were to conclude that changed circumstances did not compel reconsideration of the Defendant's bond conditions, a separate statutory ground [§3142(i)] by the Defendant would require his release here."); *see also U.S. v. Kennedy*, 2020 WL 1493481 (E.D. Mi. March 27, 2020) (also recognizing §3142(i) is an independent basis for release).

In addition to its independent operation, §3142(i) is also broad, allowing courts to release a person when "necessary for the preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). With this broad standard, courts increasingly agree Covid-19-related concerns are valid grounds to release a person under §3142(i). *See, e.g., U.S. v. Kennedy*, 2020 WL 1493481 at *4 ("Even if defendant did not have a heightened susceptibility to Covid-19, the public health crisis—and its impact on Defendant's ability to present a defense—nonetheless satisfies §3142(i)."); *U.S. v. Hernandez*, 2020 WL 1503106 (S.D.N.Y.

March 30, 2020) (finding "compelling reasons exist for temporary release of the defendant from custody [under §3142(i)] during the current public health crisis."")). The release is not permanent, but rather temporary—akin to a furlough. *See* 18 U.S.C. § 3142(i) (noting a judicial officer may "permit the ***temporary*** release" of a person) (emphasis added).

Here, Mr. Ortiz fits both grounds for release under §3142(i). His comorbidities place him in the CDC-recognized "high-risk category," and his access to counsel is impaired while visits to the Spokane County Jail are kept to a minimum. His grounds for release under §3142(i) are all-the-more compelling given the Spokane County Jail is even less-prepared than DOJ for Covid-19.

And while the United States may assert there aren't any Covid-19 cases in the Spokane County Jail (yet), that argument is unpersuasive for a few reasons:

***First***, the reason health officials recommend releasing folks in select cases is to *decrease* the risk Covid-19 will spread, as "each time a new person is added to the jail, it presents at least some risk to the personnel who operate that facility and to the people incarcerated therein."[75]

***Second***, "waiting for either Defendant to have a confirmed case of Covid-19, or for there to be a major outbreak in Defendant's facility . . . could have devastating

---

[75] https://www.law360.com/articles/1260965/attachments/0 at 2.

consequences for Defendant and would create serious medical and security challenges to the existing prison population and the wider community." *Kennedy*, 2020 WL 1493481 at *5.

    ***Third,*** jail officials recognize "[t]he chances of Covid-19 coming into this building are pretty good . . . ,"[76] and there is no requirement under §3142(i) that people start falling ill before compelling reasons exist. Preventing Covid-19's spread is reason enough.

## C.    Probation and the United States' concerns are addressable.

    Both Probation and the United States raised certain concerns about Mr. Ortiz's release. Each is addressable.

| Concern | Why Its Addressable |
|---|---|
| ***Warrants.*** Mr. Ortiz has pending warrants in Grant County for driving with a suspended license. | These warrants were issued in February 2020 because Mr. Ortiz failed to appear in Grant County for his court proceedings, an impossibility since he in-custody at the time. These don't speak to a *volitional* decision miss court. Actually, the opposite is true: Mr. Ortiz notified undersigned counsel about these upcoming hearings to see if he could avoid getting warrants, a testament to his desire to make his court appearances, not miss them. |
| ***Honesty Towards Probation*** | Probation expressed concern about releasing Mr. Ortiz because he allegedly lied to probation about having legitimate employment while on supervision. Mr. Ortiz's defense team contacted Borton Fruit (where he told Probation he worked) and spoke with Josie Garza, a field payroll specialist. Ms. Garza confirmed Mr. Ortiz worked at Borton from May thru June 29, 2019 (right when he left Yakima to care for Ms. Caton). He did not lie. |

---

[76] bit.ly/Inlander-SCJ-Ill-Equipped

| Concern | Why Its Addressable |
|---------|---------------------|
| *Lack of Legitimate Employment* | As stated above, Mr. Ortiz had legitimate employment at Borton Fruit. |

## IV.    Conclusion

It is not whether Covid-19 will enter the Spokane County Jail, but when. That inevitability is dangerous for Mr. Ortiz, who is at higher risk for becoming seriously ill. Mr. Ortiz is not incarcerated at the jail for drug distribution, robbery, or committing a violence offense; he is incarcerated for wanting to make a necklace from a bullet (and misinterpreting his SR obligations). In this Covid-19 environment, where health risks are an especially-persuasive §3142(g) factor, his risks are manageable under the Bail Reform Act with the following specialized conditions:

1. reside at Fabiola Lopez's address in Yakima;

2. check in weekly with U.S. Probation (or as directed);

3. check in weekly with defense counsel (or as directed);

4. wear an electronic home monitoring device; and

5. submit to home detention.

If the Court finds otherwise, then Mr. Ortiz respectfully asks the Court to join the legion of other courts recognizing extraordinary times like these call for his release under §3142(i).

A vulnerable man suffering from comorbidities should not be held in a petri dish for infection over a bullet.

Dated: April 8, 2020

Federal Defenders of Eastern Washington & Idaho
s/ John B. McEntire, IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org

## Service Certificate

I certify that on April 8, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Michael Ellis

s/ John B. McEntire IV
John B. McEntire, IV, WSBA #39469
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
jay_mcentire@fd.org